# 25-2733-cv

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

➤➤ ◄◄

CREDITINCOME LIMITED, CREDITINCOME PENSION SCHEME, DOUBLE PLATEAU HOLDINGS LLC, GI RUI CO., LTD., RED WHITE INVESTMENT, LTD., RUI GI LOU INTERNATIONAL CO., LTD, SOLAR TALENT INTERNATIONAL LIMITED, SPRINGCORE LTD, WESTONBIRT FUND LP, THE NOMURA TRUST AND BANKING CO., LTD., AS TRUSTEE FOR 039909706, ALLIANCEBERNSTEIN GLOBAL HIGH INCOME MOTHER FUND, AB SICAV I - ALL MARKET INCOME PORTFOLIO, AB CANADA CORE PLUS ADVANCED BOND FUND,

*(Caption Continued on the Reverse)*

---

*On Appeal from the United States District Court*
*for the Southern District of New York*

## BRIEF FOR DEFENDANT-APPELLEE

William Savitt
Anitha Reddy
Tala A. Doumani
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

*Attorneys for Defendant-Appellee*
*The Swiss Confederation*



PHP (212) 719-0990
appeals@phpny.com

AB Bond Fund, Inc. - AB Bond Inflation Strategy, AB SICAV I - Global Income Portfolio, Skymark Company S.A., Sanford C. Bernstein Fund, Inc. - AB Intermediate Duration Portfolio, AB SICA V I - Global Plus Fixed Income Portfolio, AB Active ETFs, Inc. - AB High Yield ETF, Kamina Holdings Limited, AB SICAV I - Short Duration Income Portfolio, AB Canada Core Plus Long Duration Bond Fund, Song Wen Tyng, KSH Financial Holdings Limited, Custody Bank of Japan, Ltd, as trustee for 01229−1001/119701, AllianceBernstein High Yield Open, AB SICAV I - US High Yield Portfolio, AB FCP I - American Income Portfolio, AB SICAV I - Global Dynamic Bond Portfolio, AB SICAV I - Sustainable Euro High Yield Portfolio, AB SICAV I - Financial Credit Portfolio, Raymond B.V.I. Limited, AB High Income Fund, Inc, AllianceBernstein Global High Income Fund, Inc., AB Bond Fund, Inc. - AB Total Return Bond Portfolio, AllianceBernstein Dynamic Global Fixed Income Fund, Custody Bank of Japan, Ltd. as trustee for 01729-9180/901080, AB Global Hybrid Securities Mother Fund, AB Active ETFs, Inc. - AB Short Duration Income ETF, Exclusive Plus Project Management, Zhang Sherwin, AB FCP I - Global High Yield Portfolio, AB LP, AB Collective Investment Trust Series - AB US High Yield Collective Trust, Sanford C. Bernstein Fund, Inc. - Overlay B Portfolio, AB Canada Core Plus Bond Fund, Sanford C. Bernstein Fund II, Inc. − Bernstein Intermediate Duration Institutional Portfolio, Bybrook Capital Master Fund LP, Luen Po BVI, AB Bond Fund, Inc. - AB Income Fund,

*Plaintiffs-Appellants,*

*v.*

The Swiss Confederation,

*Defendant-Appellee.*

# TABLE OF CONTENTS

ISSUE PRESENTED ................................................................................1

STATEMENT OF THE CASE ................................................................1

SUMMARY OF ARGUMENT ..............................................................16

ARGUMENT ........................................................................................19

I.   SWITZERLAND IS IMMUNE FROM JURISDICTION UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT BECAUSE IT DID NOT ENGAGE IN COMMERCIAL ACTIVITY ......................................19

    A. The district court properly considered the context of Switzerland's alleged actions in assessing whether Switzerland acted in the manner of a private market participant ........................................................20

    B. The nature of Switzerland's alleged actions to facilitate the acquisition of Credit Suisse confirms that it did not act in the manner of a private market participant ........................................................24

        1. Switzerland's extension of loans and guarantees to Credit Suisse and UBS ..................................................................................24

        2. Switzerland's directives and demands to Credit Suisse ............32

        3. Switzerland's enactment of a federal ordinance altering the law that would have otherwise applied to the acquisition of Credit Suisse ....................................................................................40

    C. Even assuming that plaintiffs have shown that Switzerland engaged in commercial activity, that showing is insufficient to abrogate Switzerland's immunity under the FSIA ......................................43

CONCLUSION ....................................................................................45

# TABLE OF AUTHORITIES

Cases:

*Adler* v. *Republic of Nigeria*,
107 F.3d 720 (9th Cir. 1997)......................................................42 n. 7

*Anglo-Iberia Underwriting Mgmt. Co.* v. *P.T. Jamsostek (Persero)*,
600 F.3d 171 (2d Cir. 2010)........................................................*passim*

*Barnet* v. *Ministry of Culture & Sports of the Hellenic Republic*,
961 F.3d 193 (2d Cir. 2020)..........................................15, 34, 38, 39

*DRFP L.L.C.* v. *Republica Bolivariana de Venezuela*,
706 F. App'x 269 (6th Cir. 2017) ............................................42 n. 7

*EM Ltd.* v. *Republic of Argentina*,
473 F.3d 463 (2d Cir. 2007)..........................................................28, 29

*Eric M. Berman, P.C.* v. *City of New York*,
796 F.3d 171 (2d Cir. 2015)..........................................................43, 44

*Exp.-Imp. Bank of the Republic of China* v. *Grenada*,
768 F.3d 75 (2d Cir. 2014)................................................................41

*Exxon Mobil Corp.* v. *Corporacion CIMEX, S.A.*,
111 F.4th 12 (D.C. Cir. 2024) ....................................................42 n.7

*Pablo Star Ltd.* v. *Welsh Gov't*,
961 F.3d 555 (2d Cir. 2020)........................................................*passim*

*Republic of Argentina* v. *Weltover, Inc.*,
504 U.S. 607 (1992)....................................................................*passim*

*Rush-Presbyterian-St. Luke's Medical Center* v. *Hellenic Republic*,
877 F.2d 574 (7th Cir. 1989)........................................................31, 32

*Saudi Arabia* v. *Nelson*,
507 U.S. 349 (1993) ....................................................................19, 38

*United States* v. *Winstar Corp.*,
518 U.S. 839 (1996) ........................................................................40

Statutes and Rules:

Fed. R. Civ. P. 12:

Rule 12(b)(1) ...........................................................................1, 11

Rule 12(b)(6) ................................................................................11

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 et seq. ..................19

28 U.S.C. § 1603(d) ...................................................................*passim*

28 U.S.C. § 1604 .............................................................................19

28 U.S.C. § 1605(a)(2) ...............................................................*passim*

N.Y. Gen. Bus. L. § 349 ...................................................................11

Other Authorities:

Alana Pipe & Nate Rattner,
*What Are AT1 Bonds, and Why Are They Risky?*,
Wall St. J. (Mar. 24, 2023)................................................................2

Joshua Rosenbaum & Joshua Pearl,
*Investment Banking: Valuation, LBOs, M&A,
and IPOs* (3d ed. 2022) .............................................................27, 33

*What Is a Lender of Last Resort?*,
European Central Bank (Aug. 26, 2019) ........................................6

**ISSUE PRESENTED**

The Foreign Sovereign Immunities Act of 1976 creates an exception to the immunity presumptively accorded to a foreign state where the action is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).

The issue presented is whether Switzerland is immune from jurisdiction under § 1605(a)(2) because its alleged "activity . . . elsewhere" did not constitute "commercial activity."

**STATEMENT OF THE CASE**

Upon defendant Switzerland's motion, the United States District Court for the Southern District of New York dismissed the complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of jurisdiction. The district court concluded that, assuming the factual allegations of the complaint to be true for purposes of deciding the motion, no exception to Switzerland's presumptive immunity from suit under the Foreign Sovereign Immunities Act applied to the action.

Because the decision on appeal found no jurisdiction even assuming the factual allegations of the complaint to be true, this statement of the case refers to

those allegations, as well as to documents cited and relied on in the complaint and documents that may otherwise be considered on appeal.[1]

**AT1 Capital Instruments.**  In response to the 2008 global financial crisis, many countries—including Switzerland—implemented a revised banking regulatory framework, known as "Basel III," that increased minimum capital requirements for systemically important banks.  JA 43, 44 (Compl. ¶¶ 74, 76).  The expanded capital cushion is divided into two tiers, Tier 1 and Tier 2.  JA 44 (Compl. ¶ 76).  Additional Tier 1 instruments—or "AT1s" for short—are one category of Tier 1 capital instruments.  *Id.*  The terms of AT1s provide that they may be written down to zero or converted into equity "under certain, expressly enumerated conditions (generally tied to the bank's capital position and financial viability)."  JA 45 (Compl. ¶ 77).  "While AT1s pay high interest to bondholders, their mechanics can make them a risky investment.  One risk associated with AT1s is that regulators have the authority to convert the bonds to equity or reduce the value of the bonds."  Alana Pipe & Nate Rattner, *What Are AT1 Bonds, and Why Are They*

---

[1] As it did below, Switzerland disputes the allegations of the complaint, which are inaccurate in significant and numerous respects.  Accordingly, any recitation in this statement or brief of the allegations of the complaint is solely for purposes of this appeal and does not constitute an acceptance or concession of the accuracy of those allegations for any other purpose or in any other tribunal.

*Risky?*, Wall St. J. (Mar. 24, 2023, 8:00 AM), https://tinyurl.com/5n8kzm78 (cited in JA 44 (Compl. ¶ 76 & n.22)).

Before its acquisition by UBS in 2023, Credit Suisse was one of Switzerland's two largest and systemically important banks. JA 43, 45 (Compl. ¶¶ 74, 80) (The other was UBS. JA 45 (Compl. ¶ 80)). Credit Suisse was therefore subject to the authority of Switzerland's bank regulator, the Swiss Financial Market Supervisory Authority ("FINMA"). JA 41 (Compl. ¶ 66). As of March 2023, Credit Suisse had issued $17.3 billion in outstanding AT1s, slightly more than 6% of the total AT1 market of $275 billion. JA 45 (Compl. ¶ 79). Under their terms, the Credit Suisse AT1s "could only be written down, not converted into equity." JA 45 (Compl. ¶ 78). And under their terms, the satisfaction of conditions for a "Write-down Event"— which would render the AT1s valueless—could depend on the determination of the "Regulator," expressly defined as FINMA. JA 335-336 (Reddy Decl. Ex. 9 [hereinafter Credit Suisse AT1 Notes Prospectus and Terms], at Terms and Conditions pt. A, § 7(a), (b)).[2]

---

[2] The prospectuses, which included the note terms and conditions, for the Credit Suisse AT1 notes registered with the Depository Trust Company ("DTC") clearing system are attached as Exs. 1 to 9 to the Declaration of Anitha Reddy. *See* JA 32-33 (Compl. ¶ 11) (alleging that plaintiffs' claims arise from such notes). As relevant to this appeal, the prospectuses are the same. This brief cites as illustrative the last prospectus, Ex. 9, dated June 23, 2022. *See* JA250-407.

The prospectuses for the Credit Suisse AT1s emphasized this in extensive disclosure of "risk factors" for potential purchasers to consider. JA 271-305 (Credit Suisse AT1 Notes Prospectus and Terms at 10-44). As the prospectuses explained, "[t]he occurrence of a Viability Event, and a Write-down resulting therefrom, is subject to, *inter alia*, a subjective determination by the Regulator," *i.e.*, FINMA, and that, "[a]s a result, the Regulator may require and/or the federal government may take actions contributing to the occurrence of a Write-down in circumstances that are beyond the control of CSG [Credit Suisse Group] and with which CSG does not agree." JA 273 (Credit Suisse AT1 Notes Prospectus and Terms at 12). The prospectuses also cautioned that "[t]he Notes will be the obligations of CSG only and Holders must solely look to CSG for the performance of CSG's obligations under the Notes." JA 280 (Credit Suisse AT1 Notes Prospectus and Terms at 19); *see also id.* ("[t]he Notes will not be covered by any government compensation or insurance scheme" or "any government guarantee").

**Credit Suisse in Crisis.** By the early 2020s, Credit Suisse "became enmeshed in fraud and corruption scandals, leading to massive fines, civil litigation, and resulting capital outflows." JA 45 (Compl. ¶ 81); SPA 2. The scandals and litigation "spooked depositors." JA 47 (Compl. ¶ 86). By the time "customers withdrew CHF 111 billion from Credit Suisse—8% of all assets under management" in the last three

months of 2022, the Swiss government had already prepared "potential rescue plans" for the bank. JA 47 (Compl. ¶¶ 86, 88, 89); SPA 2.

In the fall of 2022, Switzerland began hosting "secret" meetings with Credit Suisse and UBS "to explore the fundamental feasibility of . . . the sale of Credit Suisse" to UBS. JA 48-49 (Compl. ¶ 93) (internal quotation marks omitted); SPA 2. "Switzerland decided, seemingly as early as November 2022, that only UBS could be considered as a buyer." JA 52 (Compl. ¶ 103) (internal quotation marks omitted). In late December 2022, FINMA held a meeting with Credit Suisse's chairman, "in which it demanded 'a concrete shortlist of potential buyers, the establishment of a virtual data room,'" and "the development of a scenario for a takeover by UBS." JA 49 (Compl. ¶ 94); SPA 2-3.

From January through March 2023, "Switzerland was in constant, and sometimes daily, contact with Credit Suisse." JA 49 (Compl. ¶ 95); SPA 3. During that time, Switzerland "talked Credit Suisse through the possibilities and pitfalls of different potential buyers, the 'cultural differences' between UBS and Credit Suisse, and the 'synergies' between them." JA 49-50 (Compl. ¶ 95); SPA 3. Switzerland also "instructed [Credit Suisse] to add further key documents to [its] data room" and then "gave UBS access to Credit Suisse's data room." JA 50 (Compl. ¶¶ 95, 96); SPA 3.

On March 15, Swiss government officials, including representatives of FINMA and the Swiss National Bank, "urged UBS to acquire Credit Suisse, and warned that if it failed to do so, Credit Suisse might be placed into Resolution"—*i.e.*, a government-initiated receivership of a large, systemically important bank in which "national financial authorities act as receiver." JA 43, 50 (Compl. ¶¶ 74, 96); SPA 3. By that time, Switzerland had "spent months perfecting" Resolution plans, as well as "plans for the temporary nationalization of Credit Suisse," which were "ready for signature." JA 47 (Compl. ¶ 89); SPA 3.

"While Switzerland was urging UBS to acquire Credit Suisse, it was also pressuring Credit Suisse to agree to the merger." JA 50 (Compl. ¶ 97); SPA 3. On March 15, the Swiss National Bank extended to Credit Suisse CHF 50 billion in "emergency" liquidity loans "with major strings attached." JA50 (Compl. ¶ 97); *see* SPA3. As the "emergency" qualification indicates, such central bank loans are available under Swiss law only after the borrowing bank affirms that it is unable to procure sufficient liquidity from any other source, including private capital markets.[3]

---

[3] As FINMA recounted in its report regarding the Credit Suisse crisis: "On 16 March 2023, the SNB [Swiss National Bank] provided CHF 38 billion in liquidity under ELA [emergency liquidity assistance] and CHF 10 billion via the liquidity-shortage financing facility (LSFF) (providing a total of CHF 48 billion). In the process, CS confirmed to the SNB that it was currently not in a position to procure sufficient liquidity either via the money or capital markets or in any other way to cover the liquidity requirements in place. . . ." JA 447 (FINMA, FINMA Report: Lessons Learned from the CS Crisis (Dec. 19, 2023) 37 [hereinafter FINMA Report]); *see also* European Central Bank, What Is a Lender of Last Resort?, ecb.europa.eu/ecb-and-you/explainers/tell-me-more/html/what-is-a-lender-of-last-resort.en.html ("The ECB and the national central banks of

Allegedly as a further condition of the loans, the Swiss Finance Minister and representatives of FINMA and the Swiss National Bank "told the CEO and Chair of Credit Suisse: 'You will merge with UBS and announce Sunday evening before Asia opens. This is not optional.'" JA50 (Compl. ¶ 97); *see* SPA3.

Credit Suisse and UBS "did not directly negotiate the terms of the merger." SPA 4 (citing Compl. ¶ 99). Instead, "Switzerland negotiated with each bank on behalf of the other." JA 51 (quoting Compl. ¶ 99). Credit Suisse "was not involved in these negotiations." JA 51 (Compl. ¶ 100) (internal quotation marks omitted). Switzerland proposed merger terms to UBS over Credit Suisse's objection, leaving Credit Suisse "only able to express its dissatisfaction." *Id.*

On March 16, confronted with the acute Credit Suisse crisis, the Swiss Federal Council (the country's highest executive authority) enacted an emergency ordinance. *See* Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans from the Swiss National Bank to Systemically Important Banks [hereinafter Emergency Ordinance], SR 952.3; *see also* JA 59 (Compl. ¶ 121 & n.88 (citing Emergency Ordinance as amended)).[4]

---

euro area countries share the role of lender of last resort. . . . The national central banks in the euro area offer the last safety net for banks that cannot get the funding they need elsewhere. This safety net is called emergency liquidity assistance, or ELA.").

[4] The text of the emergency ordinance, both as originally enacted and as amended, is available in English at the Swiss Federal Council's website. *See* Swiss Federal Council, Emergency Ordinance, SR 952.3 (Mar. 16, 2023), https://www.newsd.admin.ch/newsd/message/

The emergency ordinance authorized the Swiss National Bank to extend liquidity assistance to systemically important banks, such as Credit Suisse, in circumstances in which they could not qualify for "emergency liquidity assistance loans," which are available only upon the pledge of sufficient collateral by the borrowing bank. The ordinance authorized two new forms of liquidity assistance loans: (1) "[a]dditional liquidity assistance loans: liquidity assistance loans that are granted in addition to the emergency liquidity assistance loans and are secured by means of preferential rights in bankruptcy proceedings," and (2) "[l]iquidity assistance loans with a default guarantee: liquidity assistance loans that go beyond the additional liquidity assistance loans and are secured by means of preferential rights in bankruptcy proceedings and a federal default guarantee," specifically a "guarantee issued to the [Swiss] National Bank by the [Swiss] Confederation for securing the potential loss from liquidity assistance loans." Emergency Ordinance, SR. 952.3, Art. 2 ("Definitions").

To allow the loans to be secured through "preferential rights in bankruptcy proceedings," the ordinance created an express exception to the Swiss federal bankruptcy statute—mandating that the loans be treated as "second class" claims in the hierarchy of bankruptcy claims, "[i]n derogation" of specific provisions of the

_____

attachments/76289.pdf; Swiss Federal Council, Emergency Ordinance as amended, SR 952.3 (Mar. 19, 2023), https://www.newsd.admin.ch/newsd/message/attachments/76290.pdf.

bankruptcy statute. Emergency Ordinance, SR. 952.3, Arts. 2, 3. The ordinance also provided that a bank could be eligible for loans with a federal default guarantee only if, among other conditions, "the [Swiss] National Bank . . . confirm[s] to the FDF [Swiss Federal Department of Finance]" that the bank does not "have any further appropriate collateral to secure emergency liquidity assistance, and that the additional liquidity assistance loans are exhausted." Emergency Ordinance, SR. 952.3, Art. 4.

Three days later, on March 19, the Federal Council amended the emergency ordinance to institute further extraordinary measures to stabilize Credit Suisse and facilitate a merger with UBS. *See* JA 59 (Compl. ¶ 121 & n.88). As amended, the ordinance waived normally applicable legal requirements for shareholder approval of mergers and authorized the grant of a loss protection guarantee to UBS, up to a maximum of CHF 9 billion, for losses incurred above CHF 5 billion in winding up certain Credit Suisse assets. *See* JA 54-55, 59-60 (Compl. ¶¶ 108, 121); SPA 17; *see also* Emergency Ordinance as amended, SR 952.3, Art. 10a ("Derogations from the Mergers Act"); Emergency Ordinance as amended, SR 952.3, Art. 14a (setting forth conditions for grant of loss protection guarantee).

The amended emergency ordinance also confirmed FINMA's authority to order Credit Suisse to write down its AT1 capital if Credit Suisse was granted liquidity assistance loans secured by a federal default guarantee. *See* JA 59-60

9

(Compl. ¶ 121 (quoting Emergency Ordinance as amended, SR 952.3, Art. 5a ("At the time of the credit approval in accordance with Article 5, FINMA may order the borrower and the financial group to write down additional Tier 1 capital."))).

**The Write-Down of Credit Suisse AT1 Notes.**  As authorized by the emergency ordinance, "Switzerland offered Credit Suisse CHF 200 billion in increased liquidity [assistance loans] and UBS a CHF 9 billion guarantee against losses arising from" the merger.  JA 54-55 (Compl. ¶ 108); SPA 4.[5]

In the evening of March 19, the same day the emergency ordinance was amended, Switzerland, FINMA, the Swiss National Bank, UBS, and Credit Suisse announced that UBS and Credit Suisse had entered into a merger agreement, with UBS agreeing to pay stock consideration valued at CHF 3 billion, equivalent to approximately $3.4 billion.  JA54 (Compl. ¶ 108); SPA4.

Later that evening, FINMA ordered Credit Suisse to write down all its outstanding AT1s.  JA 55-56, 59-60 (Compl. ¶¶ 111, 121).  Although Credit Suisse believed that "the Write-Down Direction was not permissible under Swiss law or the

---

[5] The FINMA Report explains the breakdown of the CHF 200 billion in additional assistance: "The SNB [Swiss National Bank] thus granted two further lines of credit each of a maximum of CHF 100 billion with privileged creditor status in the event of bankruptcy (ELA+ and PLB) and for an amount of up to CHF 100 billion via a federal default guarantee (PLB).  In total, the SNB made liquidity assistance of up to CHF 250 billion available," including the CHF 50 billion in emergency liquidity assistance loans previously provided.  JA 449 (FINMA Report 39); *see also* JA 490 (FINMA Report 80 (explaining that "[p]ublic liquidity backstop (PLB) [r]efers to extraordinary state liquidity assistance for systemically important banks" and "is one of the standard international instruments in the event of banking crises")).

AT1s' governing terms," it was "legally compelled to carry out the Write-Down." JA 56, 58 (Compl. ¶¶ 111, 118); SPA 5.

**Proceedings Below.** Plaintiffs, alleged former holders of beneficial interests in Credit Suisse AT1s, brought this action against Switzerland, seeking to hold it liable for the write-down and consequent complete devaluation of Credit Suisse AT1 notes. JA 32-33 (Compl. ¶ 11). As amended, the complaint asserts three claims: (1) conversion or, in the alternative, tortious interference with contract; (2) a claim under N.Y. General Business Law § 349; and (3) unjust enrichment. JA 61-64 (Compl. ¶¶ 127-147). The complaint seeks as relief $372,330,000 in damages, allegedly the nominal value of plaintiffs' beneficial interests in Credit Suisse AT1s. JA 64 (Compl. 38). Switzerland moved to dismiss the complaint on three grounds: for lack of jurisdiction under Rule 12(b)(1), under the doctrine of *forum non conveniens*, or for failure to state a claim under Rule 12(b)(6).

The district court granted Switzerland's motion under Rule 12(b)(1) and dismissed the complaint with prejudice on that basis. SPA 5, 20. It therefore found it unnecessary to address Switzerland's alternative grounds for dismissal. SPA 19.

The district court recognized that, under the Foreign Sovereign Immunities Act, Switzerland is "presumptively immune from the jurisdiction of United States courts" and so plaintiffs' suit could proceed only if "a specified exception applies." SPA 6. The district court rejected plaintiffs' contention that the commercial-activity

11

exception of § 1605(a)(2) applied to their action. SPA 9-19. Plaintiffs claimed that Switzerland was not immune from jurisdiction because their action was "based . . . upon an act outside the territory of the United States"—namely, FINMA's write-down order to Credit Suisse—"in connection with a commercial activity of the foreign state elsewhere and that act cause[d] a direct effect in the United States." SPA 6 (quoting § 1605(a)(2)); JA 40 (Compl. ¶ 62). The "commercial activity" Switzerland undertook "in connection with" the write-down order, plaintiffs alleged, was "Switzerland's brokering of the Takeover"—plaintiffs' term for the acquisition of Credit Suisse by UBS. *Id.* (quoting Compl. ¶ 63).

The district court began its analysis by observing that the parties disputed whether the action satisfied the "in connection with" requirement of the commercial-activity exception. SPA 7. As the court explained, the parties disputed on both factual and legal grounds whether the write-down order was "in connection with" Switzerland's alleged facilitation of the acquisition, as that statutory phrase has been interpreted in applying the FSIA. *Id.* The court determined, however, that it "need not resolve the parties' dispute on this point" because, even assuming the requisite connection, "Switzerland's facilitation of the banks' merger was not 'commercial activity' within the meaning of the FSIA." SPA 9.

For the purposes of its analysis, the district court assumed the factual allegations of the complaint to be true. SPA 1-2 & n.2. Reviewing the variety of

actions Switzerland allegedly took to facilitate the acquisition, the court observed that "[v]iewed in isolation, at least some of these acts could be properly characterized as 'commercial activity,' because they are instances of Switzerland exercising 'powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns.'" SPA 11 (quoting *Pablo Star Ltd.* v. *Welsh Gov't*, 961 F.3d 555, 561 (2d Cir. 2020)). "But when looking at the full range of Switzerland's actions, and the overall context in which it performed them," the court concluded, "Switzerland's facilitation of UBS's acquisition of Credit Suisse did not constitute 'commercial activity' for purposes of the FSIA, as it did not consist of the exercise of 'only those powers that can also be exercised by private citizens.'" *Id.* (quoting *Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 614 (1992)).

The district court explained that its conclusion was "apparent from several factors." *Id.* These factors included, first, "the nature of the loans and guarantees provided by Switzerland to Credit Suisse and UBS." *Id.* In contrast to "garden variety" debt instruments that could be held and traded by private parties, the court observed, the loans and guarantees "were made available only to UBS and Credit Suisse." SPA 12. "Moreover," the court recognized, "the scale of these loans and guarantees far exceeds comparable activities by private actors in the market"—a scale "so dissimilar as to render the difference categorical, rather than simply one of degree." SPA 12-13. In sum, the court determined, "[t]he extraordinary nature of

these guarantees—in terms of both their form and their amounts—demonstrates that Switzerland was not operating like a private commercial lender." SPA 13.

The second factor the district court identified was "the manner in which Switzerland directed the transaction between the parties." SPA 11. The court rejected plaintiffs' attempts to analogize Switzerland's actions to those of a "sell-side" investment bank, rather than a sovereign exercising its regulatory powers. The court concluded: "[T]he allegations in the Amended Complaint reveal that Switzerland was the driving force behind the deal and left Credit Suisse with virtually no choice in [the] matter." SPA 14. As the district court observed, "[t]hat is just the opposite of how an investment bank behaves with its client. Investment banks take directions, not give them." SPA 16. The court was unpersuaded by plaintiffs' argument that "Credit Suisse obeyed because of Switzerland's financial inducements, not legal compulsion." *Id.* Plaintiffs' "use of the word 'obey' is rather telling," the court noted. *Id.* In the court's view, "[t]here is a world of difference between, on one hand, a private adviser cautioning a client that failing to make a deal could result in bankruptcy, and then allowing the client to make the final decision, and, on the other hand, a government demanding a deal, saying that it is not optional, and warning that a failure to comply might result in" the government "plac[ing]" the bank "in Resolution." *Id.*

14

The third factor the district court identified was "the legislation that Switzerland passed to implement the deal, which included the waiver of normally applicable legal requirements for shareholder approval of mergers." SPA 11. As the court explained, "*changing* the legal requirements for a merger (or eliminating some of them)—here, through bespoke financial legislation to enable UBS to acquire Credit Suisse—is something that only a *sovereign* can do." SPA 18 (emphases in original). The court rejected plaintiffs' argument that, even if this particular act to facilitate the merger was sovereign, the commercial-activity exception "remains applicable because the Write-Down Direction was connected to five months of Switzerland's other commercial acts." *Id.* (internal quotation marks omitted). "Rather," the court explained, "the inquiry as to whether the commercial activity exception applies turns on whether the foreign sovereign 'exercises *only* those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns.'" *Id.* (quoting *Pablo Star*, 961 F.3d at 561). In the court's view, "'[t]o hold otherwise and look only' at the fact that some of Switzerland's acts here are those a private actor, like a bank, could take 'would allow the [commercial activity] exception to swallow the rule of presumptive sovereign immunity codified in the FSIA.'" SPA 18-19 (quoting *Barnet* v. *Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193, 202 (2d Cir. 2020)).

15

Finally, because the district court concluded that the write-down order "was not an act taken in connection with a commercial activity of Switzerland," it explained that "it need not determine whether the Write-Down Direction 'cause[d] a direct effect in the United States'"—a further requirement for applicability of the commercial-activity exception that Switzerland had disputed. SPA 19.

## SUMMARY OF ARGUMENT

Switzerland is immune from suit in this action. Under the Foreign Sovereign Immunities Act, a federal court lacks subject-matter jurisdiction over a claim against a foreign sovereign unless a specified exception applies. Plaintiffs invoke the "commercial activity" exception of § 1605(a)(2). The district court correctly held that the exception does not apply to this action because Switzerland's alleged facilitation of the acquisition of Credit Suisse by UBS did not constitute "commercial activity."

A. A foreign state engages in commercial activity for the purposes of the commercial-activity exception when it acts, "not as a regulator of a market, but in the manner of a private player within it." *Anglo-Iberia Underwriting Mgmt. Co.* v. *P.T. Jamsostek (Persero)*, 600 F.3d 171, 176 (2d Cir. 2010) (quoting *Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 614 (1992)). Whether the character of a foreign state's activity is "commercial" is determined by reference to the "nature" of its conduct, not its "purpose." § 1603(d). Contrary to plaintiffs' contention, the

16

district court properly considered the context of Switzerland's actions in determining whether their "nature" indicated that Switzerland had acted "in the manner of" a private market participant.

B. Switzerland's alleged conduct did not constitute "commercial activity" because the particular actions it allegedly undertook to facilitate the acquisition of Credit Suisse were not comparable to those of private market participants.

1. Plaintiffs contend that the liquidity assistance loans and loss protection guarantee Switzerland provided to Credit Suisse and UBS, whose total potential value exceeded CHF 250 billion, constituted "commercial activity" because private parties lend money and investment banks arrange merger financing. The district court correctly held that the nature of this extraordinary financial assistance—considering both its form and amount—confirmed that it was unlike garden-variety financial instruments traded by private parties and so not properly characterized as "commercial activity."

2. Plaintiffs contend that, in the months leading to the acquisition, Switzerland performed the same functions for Credit Suisse that an investment banker customarily performs for its client in a merger transaction. The district court correctly held that Switzerland—which by plaintiffs' own account issued instructions and demands, not suggestions, to Credit Suisse—acted not as an advisor or broker, but rather invoked its sovereign regulatory authority to facilitate the

17

transaction. Plaintiffs' attempt to downplay Switzerland's conduct as analogous to the "hardball" negotiation tactics used against private parties in financial distress ignores the fact that Switzerland had the sovereign power to impose alternatives on Credit Suisse that a private party did not. And plaintiffs' argument that Switzerland engaged in "commercial activity" if its course of conduct facilitating the acquisition included even a single arguably "commercial" act has no support in either the text of the FSIA or the decisions interpreting it.

3. Plaintiffs contend that Switzerland's enactment of an ordinance waiving the legal requirements otherwise applicable to the acquisition was not sovereign activity because private parties may petition the government for regulatory exceptions. But the district court rightly concluded, in accord with Supreme Court precedent, that the issuance or alteration of financial regulations is sovereign activity.

C. Because the district court concluded that the exception to immunity set forth in the third clause of § 1605(a)(2)—the only exception plaintiffs invoke—did not apply to this action because Switzerland did not engage in "commercial activity," it did not reach Switzerland's alternative jurisdictional and non-jurisdictional arguments for dismissal. If this Court disagrees with the district court's conclusion, a remand for it to consider those arguments would be appropriate.

## ARGUMENT

## I. SWITZERLAND IS IMMUNE FROM JURISDICTION UNDER THE FOREIGN SOVEREIGN IMMUNITIES ACT BECAUSE IT DID NOT ENGAGE IN COMMERCIAL ACTIVITY

The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*, provides "the sole basis" for obtaining jurisdiction over a foreign state in the United States. *Pablo Star Ltd.* v. *Welsh Gov't*, 961 F.3d 555, 559 (2d Cir. 2020). "Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Id.* (quoting *Saudi Arabia* v. *Nelson*, 507 U.S. 349, 355 (1993)); *see* § 1604. Because plaintiffs acknowledge Switzerland is a foreign state, they bear the burden of "mak[ing] an initial showing that an enumerated exception to sovereign immunity applies." *Pablo Star*, 961 F.3d at 560; *see also id.* ("Once the plaintiff has met its initial burden of production, the defendant bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply.").

Plaintiffs invoke the third clause of the "commercial activity" exception, set forth in § 1605(a)(2). Under § 1605(a)(2), a foreign state is not immune from suit in any case

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state

19

elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Whether jurisdiction exists here thus depends on whether this action is "based . . . upon an act outside the territory of the United States" that was taken "in connection with a commercial activity" of Switzerland outside this country and that "cause[d] a direct effect in the United States." *Id.*

Plaintiffs allege that their claims are "based . . . upon" FINMA's "Write-Down Direction" to Credit Suisse. JA 40 (Compl. ¶ 62). And plaintiffs allege that the "commercial activity" Switzerland undertook "in connection with" the Write-Down Direction was "Switzerland's brokering of the Takeover" of Credit Suisse by UBS. JA 40 (Compl. ¶ 63). The district court correctly held that, assuming the factual allegations of the complaint to be true, jurisdiction is lacking because "Switzerland's facilitation of the banks' merger was not 'commercial activity' within the meaning of the FSIA." SPA 9.

### A. The district court properly considered the context of Switzerland's alleged actions in assessing whether Switzerland acted in the manner of a private market participant

The FSIA provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Although that instruction "leaves the critical term 'commercial' largely undefined,"

the FSIA "largely codifies the so-called 'restrictive' theory of foreign sovereign immunity." *Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 612 (1992). Under that theory, "[a] foreign state engaging in commercial activities does not exercise powers peculiar to sovereigns; rather, it exercises only those powers that can also be exercised by private citizens." *Id.* at 614 (internal quotation marks and alterations omitted). Accordingly, "a foreign state engages in commercial activity 'when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it.'" *Anglo-Iberia Underwriting Mgmt. Co.* v. *P.T. Jamsostek (Persero)*, 600 F.3d 171, 176 (2d Cir. 2010) (quoting *Weltover*, 504 U.S. at 614).

In articulating this standard in *Weltover*, the Supreme Court recognized that "the Act provides that the commercial character of an act is to be determined by reference to its 'nature' rather than its 'purpose.'" 504 U.S. at 614 (quoting § 1603(d)). Therefore, the Supreme Court explained, "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives." *Id.* "Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Id.* (emphasis in original) (internal quotation marks omitted); *see also id.* at 617 (explaining that a court must "separate 'purpose' (*i.e.*, the *reason* why the

21

foreign state engages in the activity) from 'nature' (*i.e.*, the outward form of the conduct that the foreign state performs or agrees to perform)").

Plaintiffs contend that the district court erred by improperly considering—"under the guise of 'context'"—the "purpose," rather than the "nature," of Switzerland's alleged actions.  Pl. Br. 18, 26-32.  But the district court rightly focused on the "form" of Switzerland's actions, not the "reason[s]" for its actions. *Weltover*, 504 U.S. at 617.  After reviewing "the full range of Switzerland's [alleged] actions, and the overall context in which it performed them," the district court concluded that it was the "nature" and "manner" of those actions, not their "purpose," that showed they were not "the *type* of actions by which a private party engages in 'trade and traffic or commerce.'"  SPA 10-11 (quoting *Weltover*, 504 U.S. at 614); *see also* SPA 14 (expressly disclaiming that "the Court's conclusion here . . . hinges on Switzerland's *purpose*" (emphasis in original)).

Nor was it improper, let alone forbidden, for the district court to consider the "context" of Switzerland's actions in determining whether they were analogous, in "nature," "manner," and "outward form," to those of a private party engaging in commerce.  *Weltover*, 504 U.S. at 614-15, 617; *see also id.* at 615-16 (concluding that foreign state's activity, even considered "in full context," was "not analogous to a private commercial transaction").  To the contrary, this Court recognized in *Pablo Star* that "[s]eparating the 'nature' from the 'purpose' of an activity may require a

22

nuanced examination of the context of the acts involved." 961 F.3d at 561. That is so, the Court explained, because correctly assessing the character of a foreign state's conduct "may sometimes depend on the level of generality at which the conduct is viewed." *Id.* "[I]gnor[ing] the context" of a foreign state's actions, the Court cautioned, risks overlooking "an important part of defining the activity being assessed." *Id.* at 562.

In faulting the district court's analysis, plaintiffs suggest that any examination of "context" is unnecessary because the test for commercial activity is simple: "Could a private party lawfully engage in the same conduct?" Pl. Br. 26. But that is not the test—which is why plaintiffs do not supply any citation for their formulation, let alone an authoritative one. Merely showing that a foreign state's action would be lawful if undertaken by a private party is not enough to show that the action is one undertaken "in the manner of" a private market participant—or put another way, that the action is "the type of action[]" by which a private party engages in trade or commerce. *Weltover*, 504 U.S. 614; *see also Pablo Star*, 961 F.3d at 561. And it is the latter standard—the governing standard—that the district court correctly applied to hold that plaintiffs failed to show commercial activity by Switzerland.

23

**B.** **The nature of Switzerland's alleged actions to facilitate the acquisition of Credit Suisse confirms that it did not act in the manner of a private market participant**

Plaintiffs contend that Switzerland's "months-long campaign to broker the sale of Credit Suisse" to UBS "constitutes commercial activity" because Switzerland's "broader course of conduct . . . could have been (and customarily would have been) performed by an investment bank." Pl. Br. 33. But that argument contradicts and disregards plaintiffs' own allegations of Switzerland's conduct. As the district court's decision explains, the factual allegations of the complaint refute the notion that Switzerland's conduct can be reasonably analogized to that of a bank or private broker. Plaintiffs fail to show any error in the district court's analysis.

**1. Switzerland's extension of loans and guarantees to Credit Suisse and UBS**

The complaint alleges that, to facilitate the merger, "Switzerland offered Credit Suisse CHF 200 billion in increased liquidity [assistance loans] and UBS a CHF 9 billion [loss protection] guarantee against losses arising from" the merger. JA 54-55 (Compl. ¶ 108); *see also* SPA 13 & n.10 (noting "the relatively equal value of Swiss Francs and US Dollars"). Plaintiffs contend that because private parties borrow and lend money and investment banks arrange merger financing, Switzerland's actions were commercial. Pl. Br. 34-36, 40-44.

As the district court observed, "[a]t that level of generality, Switzerland's actions could perhaps be considered as analogous to those 'exercised by private

24

citizens,' as private financial institutions issue loans and loss protection guarantees." SPA 12. But as the Supreme Court's analysis in *Weltover* shows, that level of generality is too high to reliably assess whether a foreign state's borrowing or lending activity is "analogous to a private commercial transaction." 504 U.S. at 616. In *Weltover*, the Supreme Court held that Argentina's issuance of certain bonds— called "Bonods"—was commercial activity under the FSIA. *Id.* at 615. The Supreme Court explained that "[t]he commercial character of the Bonods is confirmed by the fact that they are in almost all respects garden-variety debt instruments: They may be held by private parties; they are negotiable and may be traded on the international market (except in Argentina); and they promise a future stream of cash income." *Id.*

If simply observing, as plaintiffs do, that private parties borrow and lend money were sufficient to establish that any borrowing or lending by a foreign state is commercial activity, the Supreme Court would have had no need to examine the particular features of the Argentinian bonds at issue, let alone confirm their comparability to bonds issued by private parties. But the Supreme Court proceeded to do just that. That is because a foreign state's action is not properly deemed commercial activity just because the action, considered generally or in the abstract, falls into some broad category of action also undertaken by private parties. Rather, "the issue is whether the particular actions that the foreign state performs . . . are the

*type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* at 614 (emphasis in original).

Here, the particular loans and guarantee provided by Switzerland were not of the type provided by a party engaged in commerce. As the district court recognized, the liquidity assistance loans and loss protection guarantee provided by Switzerland were not "garden-variety" financial instruments. SPA 12. "[T]hey were not negotiable or tradeable, but rather were made available only to UBS and Credit Suisse," and their "scale . . . far exceeds comparable activities by private actors in the market." SPA 12-13. Indeed, the Swiss National Bank was authorized to extend the loans because no private party could or would provide such loans. Emergency Ordinance, SR. 952.3, Arts. 2, 3, 4 (setting forth the different types of liquidity assistance loans and conditions for their issuance). The complaint does not contest that, as a matter of Swiss law, Credit Suisse was required to—and did—affirm that it could not obtain the necessary liquidity from any other source, including private markets. *See* JA 447, 449 (FINMA Report 37, 39). Moreover, the liquidity assistance loans authorized under the Emergency Ordinance were secured by a privileged bankruptcy claim for the Swiss National Bank because Credit Suisse lacked sufficient collateral to secure further liquidity assistance, and in part by a default guarantee backed by Switzerland (and ultimately its taxpayers.) *See* Emergency Ordinance, SR 952.3, Arts. 2, 3, 4.

26

The CHF 200 billion in liquidity assistance loans that plaintiffs allege the banks received "[a]s part of the transaction," JA 54 (Compl. ¶ 108), thus bore no resemblance to loans made by private market participants. Rather, the specific attributes of the loans made by the Swiss National Bank confirm that it was acting as the country's default lender, providing extraordinary liquidity assistance to a bank unable to procure such assistance in the private markets. Far from acting "in the manner of a private player within" the market, Switzerland was acting as a market backstop, lending at a speed and on a scale that no private party could or would. *Weltover*, 504 U.S. at 614. As the district court concluded, "[t]he extraordinary nature of these guarantees—in terms of both their form and their amounts—demonstrates that Switzerland was not operating like a private commercial lender." SPA 13.

Contrary to plaintiffs' contention, the loans and guarantee Switzerland provided were not remotely akin to merger "financing" arranged by investment banks. As the investment banking textbook plaintiffs cite as authoritative explains, "form[] of financing for corporate M&A transactions . . . refers to the sourcing of internal and/or external capital used as consideration to fund an M&A transaction." Joshua Rosenbaum & Joshua Pearl, *Investment Banking: Valuation, LBOs, M&A, and IPOs* 315 (3d ed. 2022). But the loans extended by the Swiss National Bank were made for the express purpose of addressing the Credit Suisse crisis, not any

funding obligation pertaining to the merger consideration. JA 50, 54-55 (Compl. ¶¶ 97, 108). The complaint does not allege that Credit Suisse, as the target of the acquisition and thus the recipient of the merger consideration, even had such a funding obligation. Nor does the complaint allege that UBS, as the acquirer, needed or used any loans from Switzerland to fund the merger consideration—for good reason, because the consideration UBS agreed to pay was entirely in the form of UBS stock. As for the loss protection guarantee, it was not a mechanism for funding the merger. By its terms, as the complaint acknowledges, it could be invoked only *after* the merger to protect UBS from losses "arising from the Takeover"— specifically, losses above CHF 5 billion incurred in winding up Credit Suisse assets. JA 54-55 (Compl. ¶ 108); *see also* Emergency Ordinance as amended, SR 952.3, Art. 14a (setting forth conditions for grant of loss protection guarantee).

This Court's decisions further confirm that the extraordinary financial assistance Switzerland provided is not commercial activity under the FSIA. In *EM Ltd.* v. *Republic of Argentina*, 473 F.3d 463 (2d Cir. 2007), the Court considered whether Argentina's borrowing relationship with the International Monetary Fund was commercial activity under the FSIA. If plaintiffs here were correct that any borrowing or lending by a foreign state is commercial activity, the Court in *EM* could have readily determined that Argentina's borrowing relationship with the IMF was commercial without further analysis. Instead, the Court concluded that the

relationship was not "commercial" "for several reasons," including that IMF loans "are not available in the commercial market," "the IMF's borrowing program is part of a larger regulatory enterprise intended to preserve stability in the international monetary system and foster orderly economic growth," and "the terms and conditions of the Republic's borrowing relationship with the IMF are not governed by a 'garden-variety debt instrument.'" *Id.* at 482-84. All of those reasons are equally applicable to the borrowing relationship between Credit Suisse and UBS, systemically important Swiss banks, and the Swiss National Bank, Switzerland's central bank.

This Court's decision in *Anglo-Iberia*, a suit against Jamsostek, "the Indonesian state-owned social security insurer," is also instructive. 600 F.3d at 174. There, the Court rejected the plaintiff's argument that Jamsostek engaged in "commercial activity" because it "behave[d] like a private insurer" in its "employment[] and supervision" of employees to perform its insurance functions. *Id.* at 177. To the contrary, the Court found, "as the default health insurer under Indonesia's national social security program," Jamsostek "does not sell insurance . . . in any traditional sense and does not otherwise compete in the marketplace like a private insurer," but rather "provides a general floor for health insurance for all workers in Indonesia." *Id.* at 177-78 (internal quotation marks omitted). The Court therefore "easily conclude[d] that Jamsostek's acts of providing basic health

insurance to Indonesia's workforce . . . are carried out in its capacity as Indonesia's default health insurer" and therefore "Jamsostek's insurance operations do not equate to those of an independent actor in the private marketplace of potential health insurers." *Id.* at 178.

Just so here. The Swiss National Bank's provision of extraordinary liquidity assistance to Swiss banks is "carried out in its capacity as" Switzerland's "default" lender, and so its lending operations "do not equate to those of" a participant in the private lending market. *Id.* Plaintiffs try to brush off the *Anglo-Iberia* case as "irrelevant," asserting that it belongs to "a distinct category of FSIA cases . . . arising from a state's employment of civil service personnel." Pl. Br. 32 (internal quotation marks omitted). But, as shown above, nothing in the Court's analysis of the character of Jamsostek's activity limited its reasoning to such cases. *Anglo-Iberia*, 600 F.3d at 177-79. Rather, the Court expressly rejected plaintiffs' argument that Jamsostek's employment of personnel rendered its activity "commercial." *Id.* at 177.

In arguing that the extraordinary financial assistance Switzerland provided constituted "commercial activity," plaintiffs disregard the specific attributes that distinguished it from "a private commercial transaction." *Weltover*, 504 U.S. at 616. Plaintiffs do not contest that it did not take the "outward form" of "garden-variety" financial instruments, customarily traded in private markets. *See id.* at 616-17. They

30

nonetheless fault the district court for emphasizing the amounts of the assistance, saying that the "scope of the particular transaction at issue" is "irrelevant" to its character. Pl. Br. 41-42. To support that contention, plaintiffs quote the Seventh Circuit's admonition that, in assessing whether a state's activity is "commercial," "it is irrelevant that no private person has ever purchased a million pairs of army boots, or a million tons of cement, in a single transaction. The important question is whether private parties purchase cement or boots, which they clearly do." *Id.* at 42 (quoting *Rush-Presbyterian-St. Luke's Med. Ctr.* v. *Hellenic Republic*, 877 F.2d 574, 580 (7th Cir. 1989)). True enough, but that is hardly an apt analogy here. Switzerland did not engage in a "garden-variety" financial transaction many times over, making the total value of its activity extraordinary, even if each individual transaction was not. Rather—and this was the district court's point—Switzerland's financial assistance was not just vast in its total amount, but in each particular transaction alleged— CHF 50 billion in a single emergency liquidity assistance loan, CHF 200 billion in further liquidity assistance loans (in the form of two credit lines of CHF 100 billion each), and CHF 9 billion in a loss protection guarantee covering Credit Suisse assets, all granted within four days. *See* SPA 12; JA 449 (FINMA Report 39 (detailing the total assistance provided)). Contrast those amounts, as the district court did, with the complaint's allegation that a "major Credit Suisse investor" offered the company capital of $3.5 billion. SPA 13 (quoting Compl.

¶ 99).  The district court was right to conclude that "[t]he scale is so dissimilar as to render the difference categorical, rather than simply one of degree."  *Id.*

As the Seventh Circuit itself cautioned in *Rush-Presbyterian*, "a court faced with a claim of immunity must be sensitive to the particular facts of the case before it."  877 F.2d at 579.  The "particular facts" of Switzerland's financial assistance fully justify the district court's conclusion that it did not constitute "commercial activity" under the FSIA.  *Id.*

### 2.  Switzerland's directives and demands to Credit Suisse

Plaintiffs argue that Switzerland engaged in "commercial activity" because "every action [it] took" in its "months-long campaign to broker the sale of Credit Suisse" was one that "customarily would have been[] performed by an investment bank."  Pl. Br. 33.  But, as the district court correctly concluded, that assertion is contradicted by plaintiffs' own allegations of Switzerland's conduct.

The complaint confirms that Switzerland did not act as an investment bank does with its client, merely advising Credit Suisse regarding its transactional options and deferring to its decisions.  The complaint alleges that Switzerland "decided, seemingly as early as November 2022, that only UBS could be considered as a buyer," "demanded" that Credit Suisse "establish[] . . . a virtual data room" and "develop[] . . . a scenario for a takeover by UBS," "instructed" Credit Suisse "to add further key documents to the data room," "gave UBS access to Credit Suisse's data

room," "declined, on Credit Suisse's behalf, [an] investor's offer to inject $3.5 billion into Credit Suisse," proposed merger terms to UBS that Credit Suisse objected to as "a cold expropriation in favor of UBS," completed merger negotiations that Credit Suisse acknowledged it "was not involved" in, and told Credit Suisse that the merger with UBS "will" happen and was "not optional." JA 49-52 (Compl. ¶¶ 94-97, 99, 100, 103).

As the district court observed, "[t]hat is just the opposite of how an investment bank behaves with its client. Investment banks take directions, not give them . . . ." SPA 16. The "leading investment banking textbook" plaintiffs tout makes the same point, explaining that "the sell-side advisor works with the seller to identify its objectives, determine the appropriate sale process to conduct," and after "compil[ing] a list of prospective buyers, . . . presents them to the seller for final sign-off." Rosenbaum & Pearl 279, 282. But by plaintiffs' own account, Switzerland, not Credit Suisse, "identif[ied] its objectives" and preferred "prospective buyer[]"—a sale to UBS—and then issued instructions, not suggestions, to Credit Suisse. *Id.*

Plaintiffs nonetheless contend that Switzerland's directives to Credit Suisse were not the authoritative commands of a regulator, but simply the sort of "hardball negotiation tactics" commonly used against "distressed counterparties." Pl. Br. 19-20; 45-48. But even if that assertion was correct, it undermines, not strengthens,

plaintiffs' claim that Switzerland's dealings with Credit Suisse were analogous to those of an investment bank with its client. *Id.* at 33-35; *see also* JA 49 (Compl. ¶ 95 (likening Switzerland to a "[s]ell-side investment bank[]")). An investment bank does not employ "hardball" tactics to impose merger terms on its own client.

And in any event, plaintiffs' assertion is incorrect. A private party could not play "hardball" as Switzerland allegedly did because a private party cannot threaten a regulatory takeover of a counterparty—and that is exactly what plaintiffs allege Switzerland did. As the district court explained:

> There is a world of difference between, on one hand, a private adviser cautioning a client that failing to make a deal could result in bankruptcy . . . and, on the other hand, a government demanding a deal, saying that it is not optional, and warning that a failure to comply might result in the bank being placed in Resolution—particularly when, as Plaintiffs allege, that government had . . . Resolution plans, as well as 'plans for the temporary nationalization,' which were 'ready for signature' at that precise moment.

SPA 16 (quoting Compl. ¶ 89). "One," the district court concluded, "is strong advice backed by a prediction; the other is a thinly veiled threat by a government to exercise its sovereign power, perhaps to go so far as to nationalize the company." *Id.*; *see also* JA 43 (Compl. ¶ 74 ("In a Resolution process, national financial authorities act as receiver" and the bank's "[l]eadership is immediately replaced.")); *Barnet* v.

*Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193, 201 (2d Cir. 2020) ("Nationalizing property is a distinctly sovereign act.").

Plaintiffs argue that "the district court's ruling here proves too much because all distressed mergers and acquisitions involve credible threats of worse alternatives." Pl. Br. 48. But that argument does not address the district court's reasoning, let alone show it to be incorrect. As the district court recognized, nothing stops a private party from trying to persuade a client or counterparty bank that, between agreeing to a merger transaction or filing for bankruptcy, a voluntary merger is the more attractive option. But as the district court also recognized, only the government has the power to "credibl[y]" present as a "worse alternative[]" its own takeover of control, either through a government-initiated and controlled receivership or through a nationalization. *Id.* That is a power "peculiar to sovereigns." *Weltover*, 504 U.S. at 614. Its exercise is therefore sovereign, not commercial, activity under the FSIA.

Plaintiffs also argue that even if the district court was right to find Switzerland's conduct non-commercial in this respect, it still erred in concluding that Switzerland did not engage in commercial activity under the FSIA. Pl. Br. 44-45. According to plaintiffs, "Switzerland's negotiations and interactions with Credit Suisse were not coercive,"—plaintiffs' term for acts exercising Switzerland's sovereign regulatory power—"until March 15, 2023," when Switzerland told Credit

35

Suisse a merger with UBS was "not optional." *Id.* at 45 (quoting JA 50 (Compl. ¶ 97)). So, they argue, Switzerland's preceding "course of conduct was thus commercial." *Id.* They likewise argue that "Switzerland's negotiations with . . . UBS" were "commercial" because they were "free from any coercion." *Id.* at 44. And "even a single commercial transaction" in an otherwise sovereign course of conduct, plaintiffs say, renders the foreign state's activity "commercial" for purposes of the FSIA. *Id.* at 45.

This argument has two, equally fatal, problems. First, plaintiffs' assertion that Switzerland engaged in arguably "coercive" conduct only with respect to Credit Suisse, and only in the last few days before the merger announcement in March 2023, is refuted by their own factual allegations of Switzerland's conduct. According to the complaint, Switzerland decided that only UBS could acquire Credit Suisse, and began issuing directives to Credit Suisse to facilitate the acquisition, far earlier—in the fall of 2022. JA 48-55 (Compl. ¶¶ 92-108); *see also* SPA 10-11. The complaint also alleges that Switzerland pressured UBS, not just Credit Suisse—by "urg[ing] UBS to acquire Credit Suisse, and warn[ing] that if it failed to do so, Credit Suisse might be placed into Resolution," a devastating outcome for UBS as Switzerland's only other major bank. JA 50 (Compl. ¶ 96). Moreover, plaintiffs' contention that Switzerland's merger negotiations with UBS were "free from any coercion," Pl. Br. 44, rests on UBS's alleged "power to dictate the terms it wanted

for the Takeover," JA 54 (Compl. ¶ 106).  But the complaint alleges that UBS's "power" was a product of Switzerland's "decision" to consider "only UBS . . . as a buyer."  JA 52-54 (Compl. ¶¶ 103, 105-106); *see also* JA 53 (Compl. ¶ 106 ("When there is only one potential buyer, . . . the seller has no leverage.")).  And that alleged decision of Switzerland itself depended upon the exercise of Switzerland's sovereign authority over Credit Suisse.

So plaintiffs' argument is a poor one even judged against their own version of the facts.  But plaintiffs' argument gets the law wrong too.  Plaintiffs do not supply a single case holding that "even a single commercial transaction" in an otherwise sovereign course of conduct renders the foreign state's activity "commercial" for purposes of the FSIA.  Pl. Br. 45.  They cite only § 1603(d).  But that section does not remotely say what plaintiffs say it does.  It provides only that "[a] 'commercial activity' means either a regular course of commercial conduct or a particular commercial transaction or act" and that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  Contrary to plaintiffs'

contention, it does not suggest that finding one act of a commercial character act in a course of conduct is sufficient to deem a foreign state's activity "commercial."[6]

Plaintiffs' atextual interpretation of § 1603(d) is contrary to the repeated instruction of the Supreme Court and this Court. "[A] foreign state engages in commercial activity 'where it exercises *only* those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Pablo Star*, 961 F.3d at 561 (quoting *Nelson*, 507 U.S. at 360); *see also Weltover*, 504 U.S. at 614 (same). Notwithstanding the clarity of that statement, plaintiffs would have this Court hold that Switzerland engaged in commercial activity merely because it arguably exercised *some* powers that can also be exercised by private citizens. *See* SPA 18-19 (explaining that "the question is not whether a foreign sovereign . . . engages in *some* activity that could be performed by a private, non-sovereign actor").

This Court has eschewed that approach to assessing the character of a foreign state's activity. In *Anglo-Iberia*, the Court rejected the plaintiff's argument that Jamsostek, Indonesia's default health insurer, should be deemed to have engaged in "commercial" activity merely because its employment of personnel resembled that

---

[6] *Weltover* specifically addressed the meaning of § 1603(d)—and its modest interpretation is nothing like plaintiffs: "The first sentence simply establishes that the commercial nature of an activity does *not* depend on whether it is a single act or a regular course of conduct; and the second sentence merely specifies what element of the conduct determines commerciality (*i.e.*, nature rather than purpose) . . . ." 504 U.S. at 612 (emphasis in original).

of private insurance companies, even though its general insurance operations were sovereign in nature. 600 F.3d at 177-78. The Court explained: "[T]o hold otherwise and look only to the fact of employment for purposes of our 'commercial activity' analysis would allow the exception to swallow the rule of presumptive sovereign immunity codified in the FSIA." *Id.* at 178. And in *Barnet*, the Court similarly rejected the plaintiff's argument that Greece should be deemed to have engaged in "commercial" activity simply because it had asserted a claim of ownership over a figurine, which a private antiquities dealer could also do. 961 F.3d at 201-02. The Court found it dispositive that Greece had asserted the claim as part of broader sovereign course of conduct "to enforce a scheme of patrimony laws." *Id.* at 202. And it too concluded that "[t]o 'hold otherwise . . . would allow the exception to swallow the rule of presumptive immunity.'" *Id.* (quoting *Anglo-Iberia*, 600 F.3d at 178).

As both *Anglo-Iberia* and *Barnet* demonstrate, the district court properly examined Switzerland's entire alleged course of conduct to broker[] the Takeover," not isolated acts, to determine whether Switzerland's activity was "commercial" under the FSIA. JA 40 (Compl. ¶ 63).

### 3. Switzerland's enactment of a federal ordinance altering the law that would have otherwise applied to the acquisition of Credit Suisse

The Emergency Ordinance enacted by the Federal Council eliminated, only for the acquisition of Credit Suisse by UBS, legal requirements for shareholder approval that would have otherwise applied to the transaction. SPA 17. The district court rightly found that act to be an exercise of "powers peculiar to sovereigns." *Id.* (quoting *Weltover*, 504 U.S. at 614). The Supreme Court has expressly recognized that the "issuance of [financial] regulations . . . is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party." *Weltover*, 504 U.S. at 614. It follows that, waiving or altering financial regulations, no less than issuing them, is an exercise of sovereign authority. SPA 17. Accordingly, the district court observed, "*changing* the legal requirements for a merger (or eliminating some of them)—here, through bespoke financial legislation to enable UBS to acquire Credit Suisse—is something that only a *sovereign* can do." SPA 18 (emphases in original); *see also Barnet*, 961 F.3d at 196 ("[t]he enactment and enforcement of . . . patrimony laws are archetypal sovereign activities").

Plaintiffs contend that the district court's "rationale fails at the threshold" because "[p]rivate dealmakers routinely seek such accommodations from regulators to close transactions." Pl. Br. 49. But as *Weltover* explained, the "authoritative control of commerce" by means of regulation is a power that "cannot be exercised

by a private party." 504 U.S. at 614. Plaintiffs' observation that private parties, who concededly lack such control, can nonetheless request a dispensation from the government, which in its sovereign authority it is free to grant or deny, just further emphasizes that the power to issue and alter regulations is a quintessentially sovereign prerogative.

Plaintiffs' reliance on decisions holding that regulatory waivers, once granted by the (U.S.) government, are contractually enforceable, is misplaced. Pl. Br. 49 (citing *United States* v. *Winstar Corp.*, 518 U.S. 839, 870, 895 (1996)). The relevant question here is not whether the Emergency Ordinance's waiver was subsequently enforceable by Credit Suisse or UBS, but whether the provision of that waiver in the first place resulted from the exercise of uniquely sovereign powers. It clearly did. Plaintiffs' invocation of cases holding that a foreign government's repudiation of a contract to which it is a party is a commercial act, even if declared through formal decree, is likewise unavailing. Such a decree does nothing more than transmit a repudiation of contract any private party is also free to make. Unlike the Emergency Ordinance, which altered the law applicable to two private parties, such a decree therefore does not exercise "authoritative control of commerce" that "cannot be exercised by a private party." *Weltover*, 504 U.S. at 614.

Plaintiffs argue that "even if the ordinance amounted to sovereign activity," the district court still erred in concluding that Switzerland did not engage in

commercial activity. Pl. Br. 20, 50-53. In making this alternative argument, plaintiffs reiterate their assertion that they need only show "a single act" of commercial character to qualify a foreign state's activity as "commercial"–even if the foreign state's activity is sovereign when its entire course of conduct is considered. *Id.* at 51. But as explained above, plaintiffs' view of the FSIA is unsupported by the statute's text and contrary to the decisions interpreting it. *See supra* Section B.2.

Plaintiffs also criticize the district court for failing to recognize that the third clause of the commercial-activity exception permits suits against foreign sovereigns for acts made "in connection with" commercial activity, § 1605(a)(2), and therefore "merely *relate* to commercial activity," Pl. Br. 51-52 (quoting *Exp.-Imp. Bank of the Republic of China* v. *Grenada*, 768 F.3d 75, 90 (2d Cir. 2014)). But the district court was perfectly clear on that point. It accepted plaintiffs' allegation that the "act" on which their action is based is the "Write-Down Direction." SPA 6 (quoting Compl. ¶ 62). And it assumed for purposes of its analysis that the Write-Down Direction was "in connection with" the alleged activity of Switzerland that plaintiffs claimed to be commercial: "Switzerland's brokering of the Takeover." *Id.* (quoting Compl. ¶ 63). As the district court expressly stated: "Even if Plaintiffs are correct that the Write-Down Direction was 'in connection with Credit Suisse's acquisition by UBS,

. . . Switzerland's facilitation of the banks' merger was not 'commercial activity' within the meaning of the FSIA." SPA 9.[7]

Contrary to plaintiffs' assertion, nothing in the district court's analysis suggests that it mistakenly required plaintiffs to show that the act upon which their action is assertedly based—the Write-Down Direction—to itself be a commercial act, rather than merely "in connection with" commercial activity. The district court held that the defect in plaintiffs' jurisdictional claim was their failure to show "commercial activity" by Switzerland, not their failure to show that Switzerland's alleged "commercial activity" was "in connection with" the Write-Down Direction.

### C. Even assuming that plaintiffs have shown that Switzerland engaged in commercial activity, that showing is insufficient to abrogate Switzerland's immunity under the FSIA

Because plaintiffs have not shown that Switzerland engaged in commercial activity within the meaning of the FSIA, they have failed to establish that the exception to immunity set forth in the third clause of § 1605(a)(2)—the only exception plaintiffs invoke—applies to this action. But even if plaintiffs did show that Switzerland engaged in commercial activity, that would not be enough to establish jurisdiction over Switzerland under the exception at issue.

---

[7] The string of out-of-circuit cases plaintiffs cite is therefore inapposite, as the cited portions all address the "in connection with" requirement of § 1605(a)(2). *See* Pl. Br. 51-52 (citing *Adler* v. *Republic of Nigeria*, 107 F.3d 720, 726 (9th Cir. 1997); *DRFP L.L.C.* v. *Republica Bolivariana de Venezuela*, 706 F. App'x 269, 274 (6th Cir. 2017); *Exxon Mobil Corp.* v. *Corporacion CIMEX, S.A.*, 111 F.4th 12, 30-31 (D.C. Cir. 2024)).

As plaintiffs acknowledge, the third clause of § 1605(a)(2) does not apply here unless FINMA's write-down order was an act both (1) taken "in connection with" Switzerland's alleged commercial activity, and (2) that "cause[d] a direct effect in the United States." Pl. Br. 23-25. Switzerland argued below that neither statutory requirement was satisfied. The district court, however, expressly declined to reach these issues, given its conclusion that plaintiffs had in any event failed to establish the requisite commercial activity by Switzerland. *See* SPA 9, 19.

Should this Court disagree with that conclusion of the district court, a remand for the district court's consideration of Switzerland's remaining jurisdictional (and non-jurisdictional) arguments for dismissal would be appropriate. "It is this Court's usual practice to allow the district court to address arguments in the first instance." *Eric M. Berman, P.C.* v. *City of New York*, 796 F.3d 171, 175 (2d Cir. 2015) (per curiam).

Plaintiffs nonetheless briefed all of Switzerland's arguments left unaddressed by the district court, asserting that they "expect[ed] that Switzerland will argue for affirmance" on alternative grounds. Pl. Br. 53-60. The source of plaintiffs' (incorrect) expectation is unclear—likely only the general rule that an appellate court may affirm the judgment for any reason supported by the record. But here the issues unaddressed by the district court include matters that might require the taking of evidence and the resolution of factual issues. *See, e.g.*, *Pablo Star*, 961 F.3d at 560

44

(explaining that, in determining issues of jurisdiction under the FSIA, the district court "resol[ves] . . . any disputed issues of fact" and "may look to evidence outside the pleadings"). In these circumstances, this Court's "usual practice" is the efficient course. *Eric M. Berman*, 796 F.3d at 175.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: February 2, 2026

/s/ William Savitt
William Savitt
Anitha Reddy
Tala A. Doumani
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
(212) 403-1000

*Counsel for Defendant-Appellee*
*The Swiss Confederation*

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), as modified by 2d Cir. R. 32.1(a)(4)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 10,698 words.

The undersigned counsel further certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and complies with the type style requirements of Fed. R. Civ. P. 32(a)(6) because it has been prepared in Microsoft Word in a proportionally spaced typeface using 14-point Times New Roman font.

/s/ William Savitt
William Savitt